**SO ORDERED.**

**SIGNED this 18 day of August, 2016.**



_____
**Joseph N. Callaway
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# FAYETTEVILLE DIVISION

IN RE:

AMY G. SWEENEY                                         Case No. 15-03664-5-JNC
                                                       CHAPTER 13
      DEBTOR

## ORDER REGARDING VALUATION OF COLLATERAL

The matter before the court is the Motion for Valuation of Collateral filed by Amy G. Sweeney (the "Debtor" or "Ms. Sweeney") on December 9, 2015 (Dkt. 11; the "Motion for Valuation") and the Response in Opposition to the Motion for Valuation filed by Ditech Financial, LLC[1] ("Ditech" or the "Creditor") on December 11, 2015 (Dkt. 15; the "Response"). A hearing took place on July 27, 2016, in Fayetteville, North Carolina. Counsel for the Debtor, counsel for Ditech, and the chapter 13 trustee, Joseph A. Bledsoe, appeared at the hearing. After consideration

---

[1] Green Tree Servicing, LLC ("Green Tree") merged with Ditech Mortgage Corp. on August 31, 2015. Because the Debtor filed her petition prior to the merger, her schedules list Green Tree as a secured creditor. As a result of the merger, the creditor holding a lien secured by Ms. Sweeney's Manufactured Home is Ditech.

of the pleadings, case record, testimony, documentary evidence, and arguments of counsel presented at the hearing, the court finds and determines as follows:

## BACKGROUND AND FACTS

Ms. Sweeney filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code on July 2, 2015 (Dkt. 1) (the "Petition Date"). In Schedule B filed with the petition, Ms. Sweeney listed as an asset of the bankruptcy estate a 1999 Horton Homes Mirage III 24' by 52' Manufactured Home (the "Manufactured Home") with an asserted present value of $11,000. Schedule D of the petition lists Green Tree Servicing, LLC (now Ditech) as holding a claim secured by the Manufactured Home. Ms. Sweeney executed a Retail Installment Contact and Security Agreement (the "Note") with Green Tree dated October 5, 1999 when she purchased the Manufactured Home, pledging it as collateral for the Note. The Creditor timely reflected its lien on the paper Certificate of Title (the "Title") for the Manufactured Home issued by the North Carolina Department of Transportation, Division of Motor Vehicles. The Manufactured Home was delivered to a lot fronting Chicken Foot Road in rural Bladen County, North Carolina, shortly after its purchase in 1999. The Manufactured Home was set up and has been used as the residence of Ms. Sweeney and her family at that location since the delivery.[2]

Although its wheels and axles were removed at set up, the Manufactured Home has not been permanently affixed to the underlying real property. No Declaration of Intent to Affix the Manufactured Home to Real Property has been filed in the Bladen County Registry, and the Manufactured Home can be removed from the land and towed away without the need for extensive further work. As a result, and the parties acknowledge, the Manufactured Home remains personal property for perfection, lien recordation, and valuation purposes. Ditech's lien on the

---

[2] Ms. Sweeney has a separate land sale contract with a separate creditor regarding the underlying real estate. Ditech does not contend it has a security interest or other rights in the land.

Manufactured Home is evidenced by a lender notation on the Title and is therefore perfected under North Carolina law. *See* N.C. Gen. Stat. §§ 20-58 and 25-9-311(a)(2). Finally, the Debtor does not contest the existence, perfection, or validity of Ditech's lien on the Manufactured Home. Ditech filed Proof of Claim No. 1-1 in this case on August 5, 2015, listing the outstanding balance of the Note at $42,742.76 as of the Petition Date. Attached to Ditech's Proof of Claim is a copy of the Note and the Title.

At the hearing, Ms. Sweeney testified at length concerning the condition of the Manufactured Home. She explained that due to prolonged leaks originating from its water heater and air conditioning unit, the floors and walls of the Manufactured Home sustained "extensive water damage." Portions of its floors and walls are consequently infested with mold, affected subflooring sections are "rotted through," portions of the home's drywall are crumbling, and some of the carpets are ruined. Only minimal repairs have been made, and Ms. Sweeney believes that the water damaged floors are "not safe by any means." Extensive photos of the interior of the Manufactured Home taken by Ms. Sweeney were introduced and allowed into evidence, effectively corroborating her testimony and illustrating the extent and pervasiveness of the water damage. Debtor's Ex. 2A–2G.

In addition to the water damage, Ms. Sweeney explained that other interior features of the home remain in disrepair. Specifically, the home's central air conditioning unit does not currently function and she relies on a single window air conditioning unit to cool the structure. The home's heating unit works only intermittently. Walls throughout the home are yellowed and otherwise discolored, and its exterior vinyl skirting is reportedly covered in algae. Further, a large gap exists

between the door frame and sliding glass door along the back of the home. Ms. Sweeney testified that she believes that the Manufactured Home is in poor condition[3] and in need of serious repairs.

Ms. Sweeney next stated that in her opinion the fair market value of the Manufactured Home is between $10,000 and $11,000 given its poor condition and the existing "structural damage." She arrived at this figure based on a combination of her personal knowledge of the Manufactured Home's condition, the required repairs, comparable home values in the area, and the Manufactured Home's assessed ad valorem tax value. Ms. Sweeney explained that she specifically requested a letter from the Bladen County Office of the Tax Administrator documenting the tax value as $9,850 and consulted the home's annual tax card, and she admitted that ultimately she relied upon the county tax valuation in concluding the home was worth $11,000 for purposes of the hearing.

Ditech presented Mr. Joseph P. Cordoni as an expert witness regarding used manufactured home valuation and appraisals. He has testified before this court as an expert on the same subject in prior cases, and his credentials were placed into the record. No objection to the tender was made and Mr. Cordoni was accepted as an expert in the case and allowed to testify on the condition, state, and value of manufactured homes in North Carolina. Mr. Cordoni testified that he visited and physically inspected the Manufactured Home in January 2016 for several hours, and that he prepared a written appraisal report (the "Appraisal"), which was admitted into evidence without objection as Creditor's Exhibit 1. The Appraisal is dated January 27, 2016. Mr. Cordoni testified that he begins each appraisal with a reference to the valuation entry for the make and model of the manufactured home at issue in the current National Automobile Dealers Association ("NADA")

---

[3] The court notes that in her testimony Ms. Sweeney was not assessing her home's condition pursuant to the National Appraisal System's guideline definition of the term "poor" as discussed in the expert witness's written appraisal, but rather uses the word "poor" in the general sense. Her descriptions and photographs, however, strongly support a conclusion of "poor" condition under any lay analysis or by general criteria.

Guide Book Retail Value. A geographic location adjustment is then applied to account for differing market conditions in geographical areas, resulting in the "Total Guide Book Retail Value." From there, the starting value is adjusted for an individual manufactured home's particular condition. The condition determination is subjective but based on National Appraisal System ("NAS") guidelines, which are divided into four general categories: excellent, good, fair, and poor.

The NAS guidelines, as specified in Mr. Cordoni's written appraisal, provide the following explanations of category terms:

> Excellent – home is new, or like new, very attractive and highly desirable; good – normal wear and tear is visible, but home is well maintained, still attractive, desirable, and useful; fair – minor deterioration apparent due to both the climate and the deferred maintenance, less attractive but obviously useful; poor – signs of structural deterioration, obvious missing or broken component items, definitely undesirable, and marginally useful.

Creditor's Ex. 1, Pg. 3.

Mr. Cordoni reports that once the NAS condition is assessed, the base value is adjusted by a percentage factor. He then examines the cost and necessity of repairs, the age of the home, and the value of any accessories or installed components not included in the base purchase price. In short, Mr. Cordoni employs a cost-approach method that is based upon and utilizes NADA and NAS guides as adjusted for particular and unique factors derived from inspection.

In this case, Mr. Cordoni began with a base value of $22,417.12 for the Manufactured Home as taken directly from the NAS Guide Book. This initial figure was then adjusted upwards about one percent based on the market for manufactured homes in eastern North Carolina, which results in a rounded "Total Guide Book Retail Value" starting point of $22,600. He next considered and then adjusted the value of the Manufactured Home to reflect his opinion of its present state and condition. Based on the inspection, Mr. Cordoni rated the Manufactured Home as being in "fair" condition under the NAS guidelines. Accordingly, he applied a discount reduction to 82%

5

of the guidebook retail value, resulting in a rounded condition base value of $18,500 for the Manufactured Home.

From there, Mr. Cordoni deducted $1,059 for the cost of replacing the home's removed and missing wheels and axles, and then reduced the result by another $5,272 for the estimated cost of itemized "necessary repairs."[4] However, he made up for the combined $6,331 replacement and repair deduction by adding to the base value another $7,474 as the value of listed additional accessories and components located in the Manufactured Home for a net addition of just over $1,100. In the end, Mr. Cordoni arrived at and testified in support of a final estimated present value for the Manufactured Home of $19,600.[5]

Accordingly, the Debtor would have the Manufactured Home value set at $11,000 while Ditech asks for a valuation of $19,600. Neither proposed figure is correct for plan confirmation purposes for the reasons discussed below.

## DISCUSSION

### A. Valuation at Replacement Value

Pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii) and in order to be confirmed, a chapter 13 plan must provide distributions to a secured creditor of at least the present value of the collateral. A claim is deemed secured "to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. . . ." 11 U.S.C. § 506(a)(1). The extent, validity, and value of the secured claim are determined under state law, and for personal property in chapter 13 plans, courts must measure the "replacement value . . . as of the date of the filing of the petition

---

[4] Mr. Cordoni's accounting for repairs included replacement of carpet and padding, painting walls and ceilings, and replacement of the air conditioning and heating unit. He estimated the aggregate cost of repairs as totaling $4,202, plus $1,070 for floor repair and linoleum replacement as discussed below.
[5] The NAS form employed by Mr. Cordoni instructs an appraiser to round the figure to the nearest hundredth dollar.

6

without any deduction for costs of sale or marketing." 11 U.S.C. § 506(a)(2). The statute then defines "replacement value" as "the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined." *Id*.

Section 506(a)(2) codifies the holding in *Associates Commercial Corp v. Rash*, 520 U.S. 953 (1997), in which the United States Supreme Court established the valuation standard to be employed when a debtor seeks to "cram down" a creditor's claim. Specifically, the Supreme Court held that "under [11 U.S.C.] § 506(a), the value of property retained because the debtor has exercised the . . . 'cram down' option is the cost the debtor would incur to obtain a like asset for the same 'proposed . . . use.'" *Rash* at 965. The Court further confirmed that replacement value does not include repossession costs when a debtor intends to retain property, as replacement value is based on a debtor's "proposed disposition or use" of the subject collateral. *Id*. at 962, citing 11 U.S.C. § 506(a).

A debtor may attempt to "cram down" a creditor's claim secured by personal property through his or her chapter 13 plan. However, the amount to be paid to that creditor through a confirmed plan must total the present value of an allowed secured claim. *See* 11 U.S.C. §§ 1322(b)(2) and 1325(a)(5)(B)(ii). Valuation contentions may be tendered by a debtor pursuant to Federal Rule of Bankruptcy Procedure 3012, which states that "the court may determine the value of a claim secured by a lien on property . . . on motion of any party in interest. . . ."

Ms. Sweeney filed her Rule 3012 Motion for Valuation for the purpose of establishing the scheduled value of $11,000 as her chapter 13 plan value. As shown in the Cordoni Appraisal and testimony, Ditech objected. The parties acknowledged and stipulated that the Manufactured Home is personal property, Ms. Sweeney intends to use the Manufactured Home as her residence, and Ditech's claim is only partially secured. Accordingly, the secured portion of the Ditech claim may

7

be crammed down to the Petition Date replacement value of the collateral. While a Motion for Confirmation has yet to be filed in Ms. Sweeney's chapter 13 case, a determination of the value of the Manufactured Home pursuant to 11 U.S.C. § 506(a)(2) is now ripe and appropriate in the case under the vehicle of her Rule 3012 Motion.

**B. Scope of Security Interest**

To determine valuation, the court must first identify the scope and extent of the pledged assets to be valued. Here, only assets subject to Ditech's valid and perfected lien under state law will be assessed and included. Property of the Debtor against which Ditech does not hold a perfected lien under Article 9 of the Uniform Commercial Code, as adopted in North Carolina, will not serve as collateral for purposes of cram down under 11 U.S.C. § 1325(a)(5)(B)(ii).

A notation on a vehicular certificate of title in North Carolina perfects a lien on the vehicle (or, as here, a manufactured home not permanently affixed to real estate) and all *accessions* thereto. *See* N.C. Gen. Stat §§ 20-58, 25-9-311(a)(2), and 25-9-335. Any non-accession items located within or adjoining the Manufactured Home must be perfected by another method, such as the recording of a UCC-1 financing statement. If no financing statement has been filed, then each item contained in the Manufactured Home must constitute an accession to be included in the valuation. *See In re Eaddy*, Case No. 15-05755-DD, 2016 WL 745277 (Bankr. D.S.C. 2016).

Accession is defined as "goods that are physically united with other goods in such a manner that the identity of the original goods is not lost." N.C. Gen. Stat. § 25-9-102(a)(1). North Carolina courts employ a two-part test to determine whether an accession exists. First, a court must consider whether the good has become an "integral part of the property to which it was attached." *Goodrich Silvertown Stores v. Caesar*, 214 N.C. 85, 87; 197 S.E. 698, 700 (N.C. 1938). Second, a court must determine whether the goods then "could be conveniently detached." *Id*. If the first prong is

8

negatively answered, or if the second prong is then affirmatively satisfied, then the item at issue does not constitute an accession.

In this case, Ms. Sweeney does not contest that Ditech's security interest attached to the Manufactured Home and items in it constituting accessions under North Carolina law, and that the underlying lien is perfected by the Title. Ditech meanwhile acknowledged that no UCC financing statement pertaining to the Debtor's assets had been filed in North Carolina. Finally, certain assets are acknowledged as accessions. The status of Ditech's potential lien against other items located inside the Manufactured Home and listed in the Appraisal is contested. The lien status ultimately turns on whether the items constitute accessions under North Carolina law, which raises questions of fact and can be a murky area.

The pertinent provision of the Note provides:

> I grant you a security interest under the Uniform Commercial Code in (1) the Manufactured Home and in all goods that are or may hereafter by operation of law become accessions to it; (2) all appliances, machinery, equipment, and other goods furnished with the Manufactured Home (whether or not installed or affixed to it) including but not limited to the items listed as 'Additional Accessories and Furnishings on page 1 of this Contract' . . . [and] (4) any substitutions or replacements of the foregoing . . . .

Claim No. 1-1, Ex. B at 3.

On page 1 of the Note, under a section titled "Additional Accessories and Furnishings," the following items, with accompanying serial numbers, are listed as collateral: "Air Condit[ioning], Range, Steps, Washer/Dryer, Skirting, Refrigerator." Based on the testimony offered at the hearing, the range, washer, dryer, and refrigerator were never physically united with the Manufactured Home and are easily and readily removable from it. Those items constitute non-accession goods under the two-prong test from *Goodrich Silvertown Stores* as the appliances are not an "integral part" of the Manufactured Home and can be "conveniently detached." In contrast,

9

the other components of the Manufactured Home listed and described in the Appraisal and confirmed by testimony are acknowledged as bolted, attached, or otherwise integrated with the Manufactured Home. Those remaining items constitute accession goods. These items include the Manufactured Home's vinyl siding (for what it is worth in an "algaed" condition), fiberglass tub, garden tub, water heater, furnace, fireplace, shutters, ceiling fans, and central air conditioning system. *Id*.

While the four identified appliances are non-accession goods, Ditech's security interest states that it attaches to the range, refrigerator, washer and dryer, and skirting in the specific language contained in the Note.[6] However, Ditech presented no evidence of *perfection* of its security interest in the four items, as no Uniform Commercial Code financing statement appears to be recorded with the Office of the North Carolina Secretary of State. As a result, the existing notation on the Manufactured Home's Certificate of Title is insufficient to perfect a security interest in the range, washer, dryer, and refrigerator. Instead, the court finds that Ditech's lien extends only to the Manufactured Home itself and the remaining listed accessions thereto, including the vinyl siding, garden tub, fiberglass tub, furnace, fireplace, shutters, and four ceiling fans. With the extent of Ditech's lien determined, the court may proceed to value the aggregate collateral securing the lien.

## C. Valuation of a Manufactured Home

This court recently considered the issue of valuation of a manufactured home for chapter 13 "cram down" purposes in *In re Hardy*, Case No. 15-05431-5-JNC, 2016 WL 3549078 (Bankr.

---

[6]Section 9-203 of the Uniform Commercial Code, as adopted by North Carolina in N.C. Gen. Stat. § 25-9-203, provides that "a security interest is enforceable against the debtor and third parties with respect to the collateral only if: (1) value has been given; (2) the debtor has rights in the collateral . . . and (3) one of the following conditions is met: (A) the debtor has authenticated a security agreement that provides a description of the collateral . . . ." In this case, all three statutory requirements for attachment were met as of the signing of the Note.

E.D.N.C. June 21, 2016). As discussed at length in that case, the starting points for the valuation are the NADA and NAS guideline standards. *See also In re Coleman,* 373 B.R. 907, 912 (Bankr. W.D. Mo. 2007).

The NADA and NAS guideline standards applicable to particular collateral may be introduced through a written appraisal buttressed by expert testimony.[7] In *Hardy*, the court began its analysis by noting that valuation of personal property is conducted on a case-by-case basis and concluded by explaining that "because the parties . . . could not agree on actual value, the suggestion from the NADA Guide provides baseline evidence but is not binding or conclusive." *Id.* at *2–3 (citing *In re Russell*, 211 B.R. 12 (Bankr. E.D.N.C. 1997)). This court in *Hardy* then employed the NADA value, as confirmed in the written appraisal, as the starting point for a manufactured home's replacement value, and subsequently made adjustments based on evidence presented in the case to arrive at its own replacement value conclusion. The same methodology will be used in the present matter.

Other bankruptcy courts have also recently utilized the NADA and NAS valuation method in considering the issue of replacement values of manufactured homes. *See, e.g.*, *Eaddy,* 2016 WL 745277 at 6; *In re Prewitt*, Case No. 15-60222, 2015 WL 8306422 (Bankr. E.D. Tex. Dec. 8, 2015) (finding "the NAS process to evaluate the retail price of a manufactured home unit consistent with, and conducive to, the determination of . . . value required under § 506(a)(2)"). Similar to *Hardy*, those courts began with a floor value based on professional appraisals and made upward adjustments for accessions and downward adjustments for the actual condition and estimated cost of necessary repairs. This methodology is widely accepted and regularly employed. *See In re Thornton*, Case No. 15-6762-RLM-13, 2016 WL 3092280 (Bankr. S.D. Ind. May 23, 2016)

---

[7] The same expert appeared in both this case and the *Hardy* case.

11

(citations omitted) ("[c]ourts have favored the use of the NADA guide and NAS to determine the replacement value of manufactured homes").

This court therefore is not strictly bound to the fair market value assertion contained in Mr. Cordoni's written appraisal, even if Ms. Sweeney cannot testify as to a conclusion on value (see discussion below). Instead, the court retains wide latitude to conduct its own valuation analysis and may consider all evidence presented. In this case, no comparable sales were presented to the court for consideration by either party. Consequently, and consistent with its prior decision, the court will employ a cost-method approach.

Ms. Sweeney's testimony detailing the current *condition* of the Manufactured Home is relevant, useful, and credible, as she resides in the Manufactured Home and is acutely aware of its condition. However, her testimony as to the *value* of the Manufactured Home is not relevant. United States District Judge Flanagan (Eastern District of North Carolina) recently discussed the issue of a homeowner's opinion on valuation in *McDuffie v. West (In re West)*, Case No. 5:15-CV-557-FL (E.D.N.C. July 15, 2016). Judge Flanagan held that "testimony based solely on a tax assessment prepared by a third-party is not an opinion 'rationally based on the [homeowner's] perception,' thus running afoul of Federal Rule of Evidence 701." *Id.*[8]

In this case, Ms. Sweeney's assessment of her home's fair market value of $10,000 to $11,000 was not based upon her independent judgment. Instead, she specifically requested a statement from the Bladen County Office of the Tax Administrator documenting the assessed value of the Manufactured Home for the 2015 tax year. The court recognizes that a home's condition is directly intertwined with and related to its value. However, as to the question of value, Ms. Sweeney's testimony was clear that in reaching a conclusion of $11,000 she almost exclusively

---

[8] Not only is this court bound by the *West* decision, but it has discounted unsupported valuation testimony from homeowners where no foundation was laid in other cases pre-dating *West* as well.

relied on the Bladen County tax office assessment to arrive at that figure. Her testimony on the condition of the Manufactured Home was not tied to her proposed fair market value. Consequently, the court finds that Ms. Sweeney exercised little to no independent judgment in rendering an opinion on the value of her home, and the court cannot afford any weight to this portion of her testimony. The court will, however, take into account Ms. Sweeney's testimony regarding the extent of water damage in determining the actual condition of the home in its valuation analysis.

The Appraisal produced by Mr. Cordoni started with a market-tested, economic-based number that was subsequently analyzed in a rational formulaic manner based on particular collateral conditions. However, the court is not required to give his testimony and the Appraisal blind obedience. Section 506(a)(2) of the Bankruptcy Code allows a court to consider both the "age" and "condition" of the subject personal property in calculating replacement value. The Manufactured Home is seventeen years old, which is adequately reflected in the NADA base value figure of $22,600. However, that value is then affected by a percentage multiplier based the actual condition of the home. Any appraisal is at least partially subjective, as the appraiser must assess the condition of the home and incorporate that finding into the final report by way of an adjustment. Thus, this component of the value calculation demands a subjective analysis by the trier of fact.

When asked if the Manufactured Home's condition could be classified as "poor" given its admitted chronic water-damaged state, Mr. Cordoni refused to answer with fact-based counterargument. Instead, he obstinately refused to consider the possibility that he may have underestimated the extent of the damage, nearly to the point of reflexive hostility. He adamantly asserted that the condition of the Manufactured Home remained "fair" pursuant to the NAS guidelines regardless of the actual appearance and damage shown in Ms. Sweeney's photographs, and he did nothing to support a condition adjustment of 82%. Although not a direct employee of

Ditech, Mr. Cordoni showed a distinct lack of independence and based his testimony primarily from the secured creditor's point of view. The court is therefore justified in taking Mr. Cordoni's valuation with the proverbial grain of salt. *See, e.g.*, *In re Gensler*, Case No. 15-10407-ta13, 2015 WL 6443513 (Bankr. D.N.M. 2015); *In re Cline*, 275 B.R. 523 (Bankr. S.D. Ohio 2001).

Weighing the testimony and evidence presented at the hearing, and when evaluated using the stated NAS criteria, the court finds that the Manufactured Home's condition falls closer to "poor" than "fair," and finds that the "condition adjustment" is 65% of the base value of $22,600, resulting in a Manufactured Home value of $14,690 before consideration of the cost of repairs and value of accession goods.

As assessed by Mr. Cordoni in the Appraisal, and including the non-accession goods, the additional component value totals $7,226. However, strikingly, and further directly affecting his credibility, Mr. Cordoni reserved only a minimal cost of repair for the extensive water damage shown at the evidentiary hearing. He asserted that only about twenty percent of the Manufactured Home floor was affected and stated that the estimated costs to repair the subfloor in the kitchen, utility room, dining room, and master bathroom were $75, $125, $95, and $175 respectively, for a total of $470. He estimated the cost to replace the affected linoleum to be $600 for a dubiously low total of only $1,070 to repair the water damage. The information contained in the Appraisal to buttress his conclusions was that only cosmetic repairs were needed. In short, Mr. Cordoni did not adequately contradict the greater damage shown in Ms. Sweeney's more extensive photographs, or explain why his lesser damage assessment was more accurate.

On the other hand, the detailed testimony of Ms. Sweeney corroborated by her photographs ably illustrated the extent and pervasiveness of actual floor, subfloor, and adjoining wall water damage, and the need for replacement of large parts of the subflooring in the affected rooms such

14

as the kitchen. For example, Mr. Cordoni apparently did not check to see if, or at least did not report whether, the support beams and other subflooring components of the Manufactured Home were rotten and damaged to a point of beyond repair. While his estimate for linoleum and subfloor replacement costs may be accurate (no rebuttal evidence was presented on this point), he did not address the cost of replacing, instead of merely patching, the subfloor. Consequently, Mr. Cordoni's floor repair estimate is insufficient and an additional $1,000 must be added to the repair budget.

As a result, the sum of $2,070 is needed to repair and replace the floor and subflooring to minimal standards, increasing the total repair cost to $6,272. Additionally, the $728 collective value of the four identified non-accession appliances included in the Appraisal, along with another $95 for damage to the home's skirting, and $144 for problems associated with the front porch must be included in the deduction total. This aggregate sum of $7,239 is subtracted from the Manufactured Home baseline value of $14,690. Adding the $7,226 value of the remaining accessories and components results in a replacement value of $14,677 for the Manufactured Home and accession items serving as collateral for Ditech, which when rounded to the nearest hundredth dollar yields a final secured interest finding of $14,700.

## CONCLUSION

Based on the foregoing, it is **ORDERED** and **DECREED** that:

1. The Manufactured Home's value is set and established as $14,700 as of the Petition Date and for plan purposes in Ms. Sweeney's chapter 13 case;

2. If necessary, the Debtor is directed to file or amend her proposed chapter 13 plan consistent with the finding on valuation; and

3. All other proper plan objections are deemed reserved.

**END OF DOCUMENT**